## No. 123.

VICKSBURG, SHREVEPORT & PACIFIC RAILROAD COMPANY vs. HENRY T. DILLARD. And THE SAME vs. J. M. FOSTER ET ALS.

In suits for the expropriation of lands for railroad purposes, the owners are entitled to the value of the lands expropriated, and also to damages, in addition to those sustained by the taking of the land.

Under our present Constitution private property can neither be taken nor damaged for public purposes without adequate compensation.

In estimating this adequate compensation, the location of the road bed near buildings, or so as to divide a cleared field, or the fact that it disturbs or destroys the system of drainage, and like circumstances, should be taken into account.

Since the damages in such cases are continuous and will last while the railroad remains. all the damages, present and prospective, which the land owner will suffer, should be assessed.

APPEAL from the Second District Court, Parish of Bossier. *Drew, J.*

*Wise & Herndon* for Plaintiff and Appellant.

*J. A. Snider* and *Alexander & Blanchard* for Defendants and Appellees.

The opinion of the Court was delivered by

MANNING, J. These cases were cumulated by consent. They present the same questions, and are proceedings by the Railroad Company to expropriate lands of the defendants alleged to be necessary for the road bed of the railway. The controversy is only over the value of the expropriated land, and the damage arising therefrom.

The jury found in separate verdicts $2,400 as the value of Dillard's

expropriated land, and $2,800 as damages to his plantation; and $2,521 as the value of the land expropriated from Foster and his co-defendants, and $2,500 as their damages. They found for the plaintiff on the right of way, according it. The plaintiff appealed.

Both the plantations are in Bossier Parish and close to Shreveport, Dillard's being the nearer. The road bed runs through the middle of the Dillard place. The Foster land is divided in two by a shed road, and the railway bed runs through the middle of that part of the plantation which is south of that road. This shed road is a covered way, built under authorization of the parochial authorities for facility of travel and transportation of freight.

The lands appear to be very valuable. The lowest estimate is far ahead of similar lands in other parts of the State, where the stimulus of returning prosperity is less felt than there. Several witnesses place the value at $65 per acre, others at $75, and one at $100. Many say that its marketable value cannot be stated, by which they mean that it cannot be bought—it is not on the market. Unlike lands generally, the woodland is as valuable as the cleared land because of its proximity to Shreveport, which affords a market for fuel, and the shed road enables its transportation at all seasons.

There is a ridge running through the highest and best land. The railway selected this as a favored spot, admirably adapted for its purposes. It was the best and most convenient location for its bed, but it is the most inconvenient and hurtful to the plantations. Each plantation is thus severed—cut in twain—so that communication between the two parts is impeded. Instead of passage to and from one part to the other being unhampered, the laborers and teams can cross and recross only at certain places more or less far apart. This inconvenience will be realized more vividly by recalling the difficulty one has to reach a spot on the opposite side of a bayou. You must travel on the side you are on till you reach a bridge, and crossing, go back to opposite where you started. Not unfrequently ten miles must be travelled to reach a spot not twenty yards distant from your starting point. It is not surprising that the intelligent and thoughtful planters, some of whom were witnesses and others were jurors on the trial below, gave great prominence to this difficulty of inter-communication, caused by the railway bed. And it is worthy of remembrance that the Code has formulated a rule for guidance in regulating a passage from an estate enclosed by surrounding lands, which may well be applied to the analogous demand of a right of way by a railroad, viz., that it shall be fixed in the place least injurious to the person on whose estate the passage is granted. Rev. Civ. Code, Art. 700 (696).

There is another consideration tending in the same direction. Each one of these plantations is in the highest condition of improvement and cultivation. Each was planned, laid out, arranged, and disposed as a symmetrical whole. The cabins, stables, ginhouses, barns, etc., have been placed with reference to the needs of the entire plantation, and to promote convenience and the better conduct of the place, and its most profitable cultivation. More important still, a system of drainage had been devised, adapted to the structure (so to speak) of the land, the maintenance of which in its integrity is the most imperatively essential condition for successful cultivation of our soil. Any considerable obstruction of this system of drainage, or serious interference with its full action, is not inconvenience but ruin. These plantations, each arranged on a harmonious plan, were in complete order when the railway bed pierced them in the middle. It runs straight through the open land separating the ginhouses from the fields, and isolating cabins from tracts intended to be cultivated by their inmates.

And there it will remain. It is not a temporary obstruction which may next year be removed, but a permanent and abiding hindrance to the cultivation of the places. Instead of free access to all parts of the plantation, crossing can be done only at fixed and widely separated spots. Time is consumed by traversing circuitous routes, and danger incurred from passing trains. In some places the road cuts through the bends in the bayous detaching small parcels of land, and putting them practically out of cultivation. The drainage is impeded. The excavations made to obtain earth for the embankment are not continuous. Patches of ground lie between, and they cannot therefore serve as a ditch.

It is argued that the enhancement in value of the defendants' property because of the railroad is a legitimate offset of the damages suffered by building it. The proof here is that the road cannot benefit these plantations, and so far as transportation of their produce is concerned, they have no use for it. This covered road, of which mention has been made, is more convenient to them and less expensive. They must load their wagons to get their produce either to the railroad or the shed road, and having had that trouble and labor, it will be more convenient to continue on the shed road, and there being no depots between these places and Shreveport no advantage is to be had by hauling to the railroad.

The Constitution enlarges and emphasises the prohibition against taking private property for public use by specially including "damaging" within the prohibition, Art. 156, and as this is an addition to the usual phraseology, it is said to denote the increased care and circum-

spection with which the organic law hedges this matter.   However this may be, it is certain that few subjects are within the cognisance of either legislative or judicial bodies of more importance than maintaining the safeguards that were in the very beginning of our government thrown around private property, and repairing the breaches that have been made in them by an unwise yielding to the clamor of those who disguised covetous desires of acquisition under the pretext of concern for public uses.   By these means the elements of damage for taking private property have often been confined within such narrow limits as to convert the constitutional protection into a false pretence, and practically make it only a " promise to the ear " which it " breaks to the hope."

The authority of Mills, in his work on Eminent Domain, is cited in the plaintiff's brief to shew that annoyances from various mentioned causes, incident to the running of railroad trains, are not actionable; and that compensation is not to be given by a court of justice for a great variety of consequential damages resulting from the construction and operation of railroads.   But when one comes to probe the matter, and inquire why such restrictions have been imposed, no reason can be assigned, except that the dicta of courts, made in the infancy of railroad law, countenanced them, and text writers have adopted them without question.

Why should not the fact that the track of a railroad runs through the heart of a plantation, and severs its arteries, and dislocates its whole framework, be an element of damage ?   Is not the injury greater if the train shoots between barn and stable, or close by ginhouse or sugar mill, than if it skirted the edges of fields, or was far removed from the inhabited enclosures ?

We are asked to disregard the verdict of the jury, and are reminded of the wisdom of that provision in the Constitution of this Court, which gives us supervision over verdicts.   The statute concerning expropriation has confided the assessment of damages to a jury selected from a special class.   None but freeholders can sit upon it, but we would not abrogate our function because of that peculiarity.   It is apparent from the record that these verdicts are not guess-work.   Some of the witnesses, when asked how they computed the damages in these cases answered, by ascertaining the annual damage to each plantation, and then giving to the owners such sum as, put at interest at the usual rate, would yield that sum.   As the damage is continuous, the reparation of it should be prospective as well as for the present.   1 Redfield on Railways, §§ 71, 74.   Others adopted another mode, i. e., ascertaining the difference between the value of the plantations before the

railroad bed was laid and now, and by some of them the difference was stated at from five to ten thousand dollars less now than before.

The jury have adopted a mean avoiding the extreme estimates—in other words have taken the testimony as a whole, and based their verdicts upon it. And we do not think they have erred.

Judgments affirmed.