(78 South. 249)

No. 21376.

LOUISIANA SOC. FOR PREVENTION OF CRUELTY TO CHILDREN v. BOARD OF LEVEE COM'RS OF ORLEANS LEVEE DIST.

(June 11, 1917. On Rehearing, April 1, 1918.)

*(Syllabus by the Court.)*

On Rehearing.

1. LEVEES ⬡⟿19—APPROPRIATION OF PROPERTY—REMEDY OF OWNER—CONSTITUTION.

Under article 312 of the Constitution, a person, part of whose property, consisting of a single unit within the Orleans levee district, is appropriated for levee purposes, has a right of action against the board of commissioners for

the recovery of its value, to be ascertained by deducting from the value of the entire property, as it stood prior to the appropriation, the value of the remainder, as it stands since the appropriation.

2. LEVEES ☞19—APPROPRIATION OF PROPERTY—REMEDY OF OWNER—ASCERTAINMENT OF VALUE—CONSTITUTION.

Where, say, one-half of improved property consisting of a definite unit is appropriated under article 312 of the Constitution, it would be as inconsistent with the right to recover its value, conferred by that article, to hold that it is to be ascertained merely by dividing the aggregate market value per square foot of the entire tract as unimproved land, and attributing the quotient to the half appropriated, as it would be to apply that process to the ascertainment of the value of one half of an oil painting, severed from the other half, and so appropriated, or of a single building, or of a collection of buildings constituting an industrial plant. The principal value of the half of a thing consists in its serving as the complement of, and thereby giving value to, and receiving it from, the other half.

3. LEVEES ☞19—APPROPRIATION OF PROPERTY—REMEDY OF OWNER—CONSTITUTION.

Inasmuch as the grant contained in article 312 of the Constitution is exceptional in character, goes no further than to confer a right of action to recover the value of property appropriated for levee purposes in a particular district, and differs from article 167, in that the latter requires the payment of damages, as well as value (in cases of expropriation), there can be no recovery of damages, as such, under that grant, but the causes thereof may, and must, necessarily, be considered in determining the value of the unappropriated property which is to be deducted from the value of the whole, in order to fix the value of that which is appropriated.

Provosty and Sommerville, JJ., dissenting.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Suit by the Louisiana Society for the Prevention of Cruelty to Children against the Board of Levee Commissioners of the Orleans Levee District. From the judgment, defendant appeals. Annulled, and case remanded to trial court for further proceedings.

James Wilkinson, of New Orleans, for appellant. James J. McLoughlin, F. S. Weis, E. M. Stafford, Wm. H. Byrnes, Jr., and Charles I. Denechaud, all of New Orleans, for appellee. I. D. Moore, City Atty., and J. F.

C. Waldo, Asst. City Atty., both of New Orleans, for Orleans Parish School Board, amici curiæ.

PROVOSTY, J.  Along the banks of the Mississippi river in the state of Louisiana earth embankments, or levees, are built for holding in the river when in times of freshet it rises above the general level of the country. There is such a levee in front of the plaintiff's property in the city of New Orleans. It is some 20 feet high, as we gather, and has a 50-foot crown and a slope on the land side of 8 to 1—8 feet horizontal to 1 perpendicular. The banks of the river are not stable; on the lower side of bends, where the current strikes, they cave, or are eroded and washed away, so that the levee has occasionally to be moved back, when dangerously close to the river bank. When it is thus moved back the space required for its new location and for the public road which usually runs along the base of the levee on the land side is taken without the necessity of an expropriation and without compensation—by right of public servitudes of levee and road which all lands fronting on rivers owe in Louisiana. Ruch v. City of New Orleans, 43 La. Ann. 275, 9 South. 473; Pontchartrain, etc., v. Board, 49 La. Ann. 570, 21 South. 765. This servitude of levee was, however, modified by the Constitution of 1898, our present Constitution, by the adoption of the following provision:

"Art. 312. Any person whose property has been appropriated within twelve months prior to the adoption of this Constitution, or whose property may hereafter be appropriated by the Orleans levee board for levee purposes, shall have a right in action against said board in any court of competent jurisdiction for the value of said property, and whatever judgments may be finally rendered against the board shall be paid out of the taxes collected by it in the same manner as other disbursements are made: Provided, that this shall not apply to batture property, nor to vacant property, where only a part thereof has been taken for levee purposes, and where the effect of the levee building would be to protect the remaining part of the same prop-

erty; nor to any property on any part of the river front, the administration and control of which is vested, for the purposes of commerce, either in the state or city authorities, and on which improvements have been erected under grants from the city of New Orleans, or other authority, nor to the said improvement: Provided, that said board shall have power to appropriate property subject to such servitude, for levee building, as under existing laws, without making such compensation in advance."

The levee in front of plaintiff's property has been moved back, and plaintiff has brought this suit under this constitutional provision.

Plaintiff's property is situated on the outskirts of the city, in a neighborhood where the streets, although platted, are not all opened, and are not cared for by the city. Whether the water, sewerage, and drainage systems of the city extend that far, the record does not show. It has a frontage of 325 feet on the river by a depth of 319 feet, and is bounded on one side by Jourdan avenue and on the other side by the land of the Ursuline Convent. Before the levee was moved back, there was a road and a banquette between the front yard and levee. Now the levee passes about 5 feet from the front porch of the main building, cutting off about half of the area of the property, including all of the front yard. The property was acquired by plaintiff in 1905, and was being used as a home for homeless children whom plaintiff took charge of, and as a sort of reformatory for culprit children sent there by the courts. The work was philanthropic; but the city contributed to the expenses. When the fact that the levee was to be moved back became known, plaintiff decided to abandon that location and locate elsewhere. But this was, as we gather, because plaintiff was under the impression that the defendant board would take and pay for the entire property. Plaintiff has discontinued that part of its work consisting in providing a home, and has turned over the premises to the city; not, however, because of the levee having been

constructed, but for the reason that the city's contribution towards the expenses of the work was considered insufficient.

Plaintiff's demand is for a lump sum of $75,000, for the entire property, on the theory that the entire property has been appropriated, and that it is worth at least that much. The argument is that the part which remains is no longer suitable for the purposes for which it has heretofore been used; it being now too small in area for those purposes, and unsanitary, owing to dampness caused by the seepage water percolating through the levee and to the drainage water from the slope of the levee, and that, therefore, the whole property has been appropriated.

But, evidently, the whole has not been appropriated. Even if it were true that the part left was no longer suitable for plaintiff's purposes, the most that this could possibly show would be that the value of this remainder had been reduced.

The servitude which the defendant board is exercising entitles it to nothing more than sufficient space for the construction of the levee. It can take no more than this, for, if it did, it would be taking land not needed for levee purposes, and all it could do with it would be to sell it, and thus it would be converted from a levee board to a sort of dealer in real estate. It is utterly without authority to use for such a purpose the money realized from taxes imposed and collected for levee purposes solely, and confided to it to be used solely for levee purposes. In like manner, and for the same reason, it can appropriate only land; not any improvements that may happen to be on the land which it appropriates. On the other hand, while it cannot appropriate these improvements, it manifestly appropriates plaintiff's property to the extent that plaintiff is deprived of these improvements; that is, to the extent that plaintiff is damaged in having to remove

them, or in losing those which have no removable value. The basis of settlement as to the property which is actually taken must therefore be the market value of the property taken with the improvements upon it, less the removable value of the improvements.

On this market value the parties are very far from agreeing. Plaintiff would have it determined by the price at which the defendant board purchased the adjoining property from the Ursuline Convent and Lambou & Noel at private sale. Defendant on the other hand would have it fixed by the general market value of similarly situated land in that vicinity.

Defendant objected to proof of what was paid to the convent and to Lambou & Noel, on the ground that the price paid in expropriation proceedings, as the result either of a judgment or of an agreement of parties, is not a safe criterion, and is not admissible. In La. Ry. & Nav. Co. v. Morere, 116 La. 997, 41 South. 236, and in La. Ry. & Nav. Co. v. Sarpy, 117 La. 156, 41 South. 477, this court held that such evidence was admissible; that the objection to it should go only to its effect.

The evidence was admissible. But these two sales are of no great assistance for arriving at the value of plaintiff's property. The price paid per square foot is testified to, but there was $58,000 worth of improvements on the convent property, and no evidence has been offered as to what was the number of feet, nor of what was the total price, except that one of the questions asked of Mayor Behrman by defendant's counsel is whether the defendant board did not pay interest to the convent on $216,000. On the Lambou & Noel property there was a sawmill plant, with all necessary buildings, and until the loss resulting from the removal of this sawmill plant is ascertained and deducted, the price paid for the naked property cannot be any criterion. The improvements thus having to be removed were appraised at $78,000,

and it took several months to make the appraisement, though, why so long, is not explained.

Father Racine testified that the convent property with the buildings upon it was worth 50 cents per square foot. But he was asked, "Did you ever hear of land down there being worth anything like that figure at private sale?" and he answered, "I don't know."

Mayor Behrman testified that the land of plaintiff. was of the same character as that of the convent and of Lambou & Noel, and that he thought the price paid to those parties per square foot would be a fair one to be paid to plaintiff; but, evidently, he meant by this no more than that the three tracts were similar in character, and that what the levee board paid to these other parties it would be fair that it should pay to plaintiff. He does not mean to imply that he knows anything about the market value of property in that neighborhood, for he frankly disclaims having such knowledge. He was asked whether the defendant levee board, as at present composed, had not purchased similarly situated property just below, from the Abattoir Company, at 22 cents per square foot, after full investigation of the value of property in that neighborhood had been made by Messrs. John Dymond and E. H. Farrar, the attorneys of the Abattoir Company, and answered that it was so if the record so showed; and he was told that the record did so show. He testified also to the fact that the defendant board, as composed when the purchase from the convent was made, had purchased from Mr. Lambou, just prior to this purchase from the convent, two lots for $20,000, which had cost Lambou $1,400, and another lot from Chief of Police O'Connor for $8,353, which some months previously had been acquired by O'Connor for $1,200.

Mr. Onorato, the real estate agent, testified that he was familiar with the property of that neighborhood, and that the three

tracts of plaintiff, the convent, and Lambou & Noel were of similar character so far as the land was concerned, and were of equal value per square foot, and that in his opinion the land in that section is worth as much as was paid by the defendant board to Lambou & Noel. On cross-examination Mr. Onorato stated that there was an "undisputable absence of industries along that entire front," meaning thereby that the property was being utilized only for residential purposes. And to the question, "Is it not a fact that the property down there is about as dead as Hector's ghost?" he answered, "It has not been very active." And to the question, "Is it not a fact that on a caving bank no sane man would establish an industry or property that was liable to go into the river, where a new levee was necessary?" he answered:

"That is reasonable to assume. Q. Is it not a fact that that seriously affects the value of property? A. Well caving banks would naturally affect demands, unless there was some way of making conditions better. Q. Well, what would cause a man with sober, common sense to put any improvements on property that is liable to go into the river? A. I would not think so."

The witness was further cross-examined as follows:

"Q. Mr. Onorato, I understood you to say that you have had no personal dealings in that district? A. No, sir. The Court: Then, I think the objection is well taken. Mr. Wilkinson: Your honor does not understand my question. He may not have had personal dealings, but he might have knowledge of dealings of others, and I am asking the question, Did he have the slightest knowledge of any sale either by these, or anybody else, to his knowledge, wherein the purchase price was anything like the figure you say this property is worth? Mr. Weis: Such an answer would necessarily be predicated upon hearsay, and I don't see how he can ask the witness to answer a question that calls for a hearsay answer. The Court: I think the objection is well taken. The witness has stated that he had no personal dealings down there, and I don't see why he should be called upon to express an opinion as to the value of the property. Q. Your acquaintance with the value of property is gained not from any sales that you know of, but your imagination, is that the idea? A. No, from my common knowledge, I could not imagine the value

of property, Mr. Wilkinson; you have to know something about it. Q. And evidently you must, if you can state with any intelligence, and you have not made any such sale: A. I told you I have not made any such sale. Q. Do you know of any? A. Such sales, I know of plenty. Q. At such figures? A. I don't know the figures. Q. At a price of 50 cents per square foot? A. Well, the Ursuline Convent brought 70 cents per square foot. Q. $1,800—did you say the Ursuline Convent sold at 70 cents per square foot? A. You are asking for information. Q. The Ursuline Convent, you are very much mistaken, it sold for 45 cents per square foot? The Court: I am going to stop this. If you are going to put this in evidence before the jury, offer them the sale— Mr. Wilkinson: I am trying to test the knowledge of this witness. The Court: Mr. Onorato says he does not know of any except by hearsay, and if you want to prove those sales, or similar dealings—that similar sales or certain dealings were made at certain prices— Mr. Wilkinson: I don't want to show that they were made at certain prices, but I want to show they were not made, and never have heard of such a sale, since the time the memory of men runneth not to the contrary."

We think that the widest latitude should have been allowed for testing the qualification of the witness to testify as to the value of property in that particular neighborhood, and that his not knowing of some 75 sales made in that neighborhood, especially if the sales were recent and in the immediate neighborhood, would have gone far towards showing that possibly Mr. Onorato, in expressing the opinion he did, was basing himself more on his general knowledge of property throughout the city than of land in the locality in question. And, in view of the acknowledgments made by him on his cross-examination, we are inclined to agree with our learned Brother that we "don't see why he should be called upon to express an opinion as to the value of the property."

The foregoing is the sum of plaintiff's evidence as to value. Plaintiff may be said to be relying almost exclusively upon the fact that a large price was paid by the levee board to the convent, and to Lambou & Noel. But what this price was for the land separate from the improvements upon it, we are un-

able to say from the record. And even if we could, these two transactions would not be conclusive, but would simply be evidence to be considered in connection with all the other evidence. The convent property was bought by the defendant board as formerly composed, not as presently composed; and one of the charges of the answer is that the price paid the convent by the former board was extravagant. And there is enough in the record to raise a suspicion that such was the case. For instance, Mr. Alfred Delavigne, witness for defendant, whose business is "abstracting titles to real estate," who once owned plaintiff's property, and all the property in that neighborhood, and had lived there for 78 years, and at the time of the appropriation of plaintiff's property was living on the property on the opposite side of Jourdan avenue from plaintiff's, and fronting on the river, testified as follows:

"Q. Then, Mr. Delavigne, what was the average market price of property in that section, irrespective of levee purchases at all, but upon the open market? A. Well, previous to the expropriation of the convent property, I have sold lots for $300 to $350, some of them fronting on the river side, and I thought I was doing well at the time. Q. That was about 10 cents per foot? A. About that. Q. But the purchase price of the Ursuline Convent property, you say, put property on the boom down there? A. Of course. Q. Nobody ever heard of such prices down there before? A. Never, and I thought even then, the price so paid was very unseemingly—I thought at one time we should be paid the same price, but I did not see how we could get it. Q. Now, as a matter of fact, did any private owner, or private transaction, either before or since that, equal the convent price? Mr. Weis: I object to that. This witness is not in a position to testify to that. Mr. Wilkinson: Q. That is to say, of your own knowledge, Mr. Delavigne, do you know of any private transaction, either before or since, of your own knowledge, that has ever equaled the prices that were paid for the convent property? A. I do not. Q. Do you know of any that have ever approximated, anywhere equaled it? A. No, sir. Q. And you were living down there at the time of the convent transaction? A. Yes, sir. Q. And lived there for 2 years after, did you not? A. Yes, sir."

For making room for the same levee this witness sold to defendant board his property opposite plaintiff's on the opposite side of Jourdan avenue, and with the price acquired better property. The area of the property he sold was 19,000 feet, and he got for it $6,000. The house on it was worth $2,000. So that the price for the land was $4,000. This would be at the rate of about 22 cents per square foot.

It also appears from the testimony of this witness that:

The average price paid by the defendant board to other parties in this neighborhood was $675 and $700 per lot. What was the area of these lots does not appear. "Q. Now, the prices that were paid, were they above the market value, or under the market value? A. You will have to qualify that. If we take the market value for the expropriation of the Ursuline Convent property, that property was worth the value, what it was paid for, but if you take the position, previous to the expropriation of the convent property, it was worth less."

Charles Roth, real estate agent, witness for defendant, testified that the part of the Lambou & Noel property which was not expropriated was left in his charge to be sold, and that although since the expropriation the City Belt Railroad had been built across the property, making it more valuable, he had been able to sell only 47,200 square feet of it, the price being 20 cents per square foot; that the piece he sold at this price fronts on the road or street along the levee.

Mr. Lloyd Posey, attorney, witness for defendant, testified that for the purpose of ascertaining what price the Abattoir Company should demand for its property when the defendant board was about to appropriate it, he, at the request of Mr. John Dymond, made an examination of all the purchases that had been made by the levee board for the last 2 years within 6 to 10 blocks on either side of the Abattoir property, and found the average price to have been "something over 23 cents per square foot." Mr. Posey's testimony leaves it doubtful whether he took into this computation the Lambou & Noel sale.

Mr. John Dymond testified that the price of

the sale by the Abattoir Company to the defendant board was 22 cents and a fraction, without the improvements, and 33 cents with the improvements, per square foot. He was then aware of the defendant board's purchase from Lambou & Noel. He also knew of the purchase from the convent; but he adds that the price paid to the nuns "was, in my opinion, something that I could not expect to get." He explains that he consented to accept this price only after having ascertained that it was the average price which the defendant board had been paying; but that the compelling reason for accepting it was that he was uncertain whether the defendant board was under the legal obligation to pay anything at all in view of the fact that only a small part of a large tract was being taken.

M. P. Dullut, witness for defendant, testified that he lives in the neighborhood in question, and that he sold front property to the defendant board along there, both vacant and improved; that the price for the vacant property was about 22 cents; that this was about 4 or 5 squares below Jourdan avenue; that there is "no substantial difference between property on the river front along there"—meaning, of course, the land, apart from improvements; that as soon as he became advised that his property would be appropriated by the defendant board he bought other property, several squares, to which he might move his improvements, and that the last he bought was at 26 cents per square foot. He says that he thinks the defendant board paid him a fair price for his property.

Dr. Martinez testified that his father's property was sold for 11 cents per square foot.

Mr. Wilkinson, counsel for defendant, and attorney for the defendant board and its agent for arriving at an amicable settlement with the property owners across whose properties the levee in question would have to pass, testified that it was he who as agent for Dr. Martinez negotiated the sale of the Martinez property; that the price of the sale was 11 cents per square foot, and that this was the best price he could succeed in obtaining after a year's efforts; that the defendant board for that part of this property which it appropriated had paid Dr. Martinez 22 cents per square foot; and that this property was within 3 blocks of plaintiff's property.

The entire property, buildings and all, had cost $10,000 in 1905, and the main building alone on it is appraised at $15,000. Neither this main building nor any other is being expropriated. The evidence leaves it doubtful whether property had appreciated at all in that neighborhood, except that those fronting on the levee had been boomed by the price paid by the defendant levee board as formerly constituted to O'Connor, Lambou & Noel, and the convent, and the probability of the levee board paying at the same rate in the future for properties similarly situated.

Upon this evidence we conclude that 22 cents per square foot would be a liberal price for plaintiff's property, without the improvements.

No separate appraisements have been put upon the land with and without the improvements. These improvements consisted in a concrete block fence along the front, an iron fence along Jourdan avenue, a board fence on the convent side of the property, a board fence separating yard from garden, and a white marble eagle upon a pedestal, and a concrete walk. Plaintiff would add to this the filling which had been done in the past, and an iron pipe running from plaintiff's pump to the river.

This filling entered into the general value of the land itself. The marble eagle has been removed; we assume without loss, as no claim is being made for it. The iron pipe could, of course, be removed, and then, after

the levee was finished, be put back in position at but a trifling expense. The fences upon the property as a whole are appraised by Mr. Andry, the architect, at $391 for the concrete block front fence, $86 for the party fence, $384 for the iron fence, and $450 for "high fences painted." And the concrete paving upon the property as a whole is appraised by him at $216. The front concrete block fence has had of course to be removed, and so much of the side fences as was on that part of the land which was appropriated. Only a small proportion of the concrete paving was upon this part of the land. About half of the iron fence was upon this land, and a little more than half of the party fence was upon it. There appears from the blueprints to have been a partition fence running from back to front between the front yard and the truck garden, but no appraisement is put upon this fence in the evidence, so far as we can discover. We assume that the concrete blocks composing the front fence would have retained approximately their original value. What would be the removable value of the party fence and of the partition fence, or of the materials composing them, we have no means whatever of ascertaining. The estimate made by Mr. Andry is of what would be the cost of installing such fences as these. Granting that the fences were as good as new, we could not assume that they had enhanced the value of the property to the full amount of their cost, and unless we do this, we are without data upon which to base a judgment. However, as plaintiff ought to be entitled to something, we will allow three-fourths of the value of these fences, say $266.66, for the concrete fence, and three-fourths of one-half of the iron fence, say $144, and three-fourths of one-half of the party fence, say $32.31, and full appraisement for one-third of the concrete pavement (practically guessing at this proportion of the concrete pavement from a glance at the blue-

prints), say one-third of $216, equal, $72. This allowance is thus being made subject to complaint from either side on application for rehearing.

Plaintiff is then entitled to judgment for 50,203 square feet at 22 cents, making $11,-044.66, plus $514.97.

For injury to the remainder of the property, we do not think plaintiff can recover. Doubtless, in one sense, this remainder is taken or appropriated in so far as it is injured. Whoever injures my property takes it to that extent. And, doubtless, for several of the injuries for which plaintiff is claiming there would clearly be a right of recovery under the law of eminent domain requiring compensation to be made for the property taken or appropriated for a public purpose. But plaintiff is not suing under the law of eminent domain, but under a special article of the Constitution. Plaintiff's suit is not based upon any right inherent in plaintiff's ownership, but upon article 312 of the Constitution. Were it not for this article, plaintiff could claim no compensation, even for that part of the property actually taken, but would have to yield it without compensation, as an effect of the servitudes of levee and road to which riparian property is subject. The article of the Constitution having reference to a taking under the eminent domain power is article 167. It not only requires compensation to be made, but emphasizes the requirement by providing that it shall be "just and adequate"; and it requires compensation to be made not only for the property taken, but also for the property damaged. And it requires the compensation to be made in advance. Article 312 is very different in its language, and, indeed, may be said to bear in a sense upon an entirely different subject, or, in other words, to provide for an entirely different case.

The present Chief Justice and the writer of this opinion were members of the consti-

tutional convention which adopted this article, and were present at the debates. In fact, the present Chief Justice drafted the article. The dictating idea was that the immensely increased cost of constructing the levees, owing to their immensely increased size, had made it advisable, as a pure matter of economy, to locate the new levees at a much greater distance from the river than formerly in order that they might not have so soon to be moved back, and that the effect of this was to render this servitude of levee so burdensome that in common justice compensation ought to be made to the riparian proprietor or person whose property was being occupied by the new levee or put on the river side of it; that the levee was no longer as formerly a mere potato ridge along the edge of the river bank, which the front proprietor could, and was required to, put up at his own expense, but a great public work, the cost of which should not be made to fall with crushing weight upon the front proprietor, but be distributed over the entire area to be protected; that the making of such compensation was impossible in the country parishes, where sufficient funds could not be provided for such compensation in addition to what was imperatively required for the levee work proper, but was in a measure possible in the city of New Orleans, where larger values were being protected and ampler means available.

It was fully realized, however, that this was imposing a tremendous burden upon the levee board, even in the parish of Orleans, and was placing in an exceptionally favored class front proprietors in that parish, and hence great caution was used in extending the favor. It was denied to vacant property of which only a part was taken; it was denied to property, the administration and control of which is vested for purposes of commerce in either the state or city authorities; and to privately owned property situated on such publicly controlled property; compensation was not required to be made in advance, but only a right of action was given, and it was given only for the property appropriated, and not also, as by article 167, for property merely damaged. The continued existence of the levee servitude, except as this servitude was thus expressly modified, was expressly recognized.

There had been previous legislation on the same subject. Act 41, p. 46, of 1892, had required compensation to be made by the Orleans levee board for property "appropriated, damaged or destroyed." But by this same act, and by Act 25, p. 28, of 1894, the extent of this compensation was limited to the value at which the property was assessed for taxation.

And beginning with the case of Vicksburg, etc., R. Co. v. Calderwood, 15 La. Ann. 481, decided in 1860, the jurisprudence of this state had recognized a distinction between the taking or appropriating of property, and the damaging of that part of the property not taken. The court had there said:

"It is contended that the railroad, in addition to the value of the land taken for the public improvement, must pay for damages which may be occasioned to the rest of the property, without regard to the advantages derived from the public work. * * * With what reason * * * can the defendant demand damages for the inconvenience occasioned in the use of his property, when the same has been more than compensated by advantages, and his land has been rendered more valuable by the labor expended in the drainage, and by the facility with which his products may be taken to market?"

In N. O. Pac. R. Co. v. Gay, 31 La. Ann. 433, this court had said:

"The court in lieu of the desired charge instructed the jury that the damages beyond the value of the land taken 'could be offset by the enhanced value of the land not sought to be expropriated, although other lands in the vicinity might be equally enhanced in value by said road; that the jury had the right to set off such damages by the advantages and benefits to the owner derived from the projected railroad and the enhanced value of the property by reason of the public improvements.'"

In Railroad Co. v. Dillard, 35 La. Ann. 1045, the court had said:

"The Constitution enlarges and emphasizes the prohibition against taking private property for public use by specially including 'damaging' within the prohibition (article 156), and as this is an addition to the usual phraseology, it is said to denote the increased care and circumspection with which the organic law hedges this matter. * * * "

In N. O. Pac. R. Co. v. Murrell, 34 La. Ann. 537, this court had said:

"They must assess the damages which the owner will sustain, in consequence of the work, in addition to the value of the property taken. * * *
"But the advantages which the owner would derive from the work may be offset against these damages, the damage suffered being only the excess of injury over benefit."

In Shreveport R. Co. v. Hinds, 50 La. Ann. 782, this court, at page 785, 24 South. 287, 289, had said:

"The question of the value of the land to be taken is distinct and separate from the question of damages."

It is thus seen that at the time article 312 came to be drafted our jurisprudence had made a clear distinction between property actually taken and property not actually taken but merely damaged—holding the latter to be compensable by benefits, but the former, not. The article has, therefore, to be read in the light of this jurisprudence, and not in the light of subsequent decisions in which this distinction has not been so clearly recognized. In view of all the foregoing, we think that this right of action thus accorded ex gratia to the riparian owner for the value of the property appropriated must be strictly construed and restricted to the value of the property actually appropriated, leaving out damages to the part of the property not actually appropriated; that the same construction cannot be placed upon it as if the servitudes of levee and road had never existed and plaintiff were exercising a right of action growing out of the ownership, and not merely one ex gratia limitatively accorded. The situation is not as if plaintiff were invoking article 167, requiring compensation to be made for property damaged.

The framers of article 312 were mindful, and plaintiff must be mindful, that the levee board, or the public it represents, does not take this property from choice for its own benefit or enrichment, but because the encroachments of the river upon the caving bank compels the taking, and that, therefore, these damages to the rest of the property are caused by the river, and are simply the consequence of the disadvantageous situation of plaintiff's property upon a caving bank; and, finally, that unless the levee was built, the entire property would be practically worthless.

For plaintiff's satisfaction we may add, however, that even if the damages in question were recoverable, they have not been established with sufficient certainty to justify the allowance.

One of the causes of damage is that plaintiff has had to put up a high board fence between the base of the levee and the main building, and that this fence cuts off the light from two of the schoolrooms on the lower floor. We can see no good reason why a wire netting or other kind of a nonlight-obstructing fence could not do just as well.

Another ground of complaint is about the seepage. But this seepage is only at such times as the water is up against the levee, and the evidence shows that there is less of it than formerly.

Another complaint is about the drainage from the slope of the levee. But whether the levee was there or not, the rainfall upon the area occupied by the levee would have to be drained off. It might not accumulate as it does now in the drainage ditch along the base of the levee; but if its presence there is injurious the remedy is to drain it off, and, if necessary, provide other means

against its causing dampness about the building. For the expense of providing these means of protection the plaintiff would have a cause of action if the case were one of ordinary expropriation, but the record is absolutely destitute of all evidence as to what the amount of this expense would be.

Another ground of complaint is that there is no longer any outlet for the property on the front. There is an outlet for pedestrians. The slope of the levee being 8 to 1, the surface allows of easy walking. If the property were deprived of all outlets, this might be said to amount to a taking of it, but it retains its side outlet on Jourdan avenue, so that the deprivation of the outlet on the front is more in the nature of an inconvenience or damage. Here again there would be a cause of action if the case were one of ordinary expropriation; but here again the lack of evidence as to what damage the property had suffered from that cause would make it impossible to give judgment for any particular amount.

In expressing the foregoing views, we do not lose sight of the fact that the appropriating of part of a property may, under certain peculiar circumstances, amount to a destruction of the value of the whole, so that compensation would have to be made for the whole. A striking instance of this would be where a house was cut in the middle. Another instance where the taking of a part would amount to something more than merely damaging the remainder would be where expenses had been incurred for adapting the property to a special purpose, and, as an effect of a part being taken, the remainder could no longer be used for said purpose, so that the increased value imparted by the incurring of the expenses would be wholly lost.

But a case of this kind would necessarily have to be highly exceptional to come within the intendment of said article 312; it would have to present the distinctive feature that what was being taken was an indivisible entity, as, for instance, a house, or an industrial plant, or something of that kind. In addition to the property actually taken there would then have to be allowed compensation for the destruction of this entity. Plaintiff's property does not present this feature. Even if the complaints as to dampness and obstruction of lights and nonaccess on front street were irremediable, this would only mean a reduction in eligibility. As to area, there is left to plaintiff more than half an ordinary city block, and the work of plaintiff is being actually continued on the premises.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be reduced to $11,559.63, and that, as thus reduced, it be affirmed; plaintiff to pay the costs of this appeal.

SOMMERVILLE, J., takes no part. O'NEILL, J., concurs in the decree.

### On Rehearing.

MONROE, C. J. Our reconsideration of this case having led to a change of opinion as to the interpretation of the law in which plaintiff's right to compensation is to be found, the following reasons for that change are assigned, to wit:

It will be conceded that the purpose for which this republican government was established was to secure those by whom it was established and their successors, in their rights of life, liberty, and property, and that, even though the Constitutions, federal and state, contained no special provisions upon the subject, it would, in a great measure, defeat that purpose if a citizen could be deprived of those rights without due process of law, and as to his property without just compensation. In order, however, that there should be no room for doubt, the Fifth and Fourteenth Amendments were added to the Constitution of the United States—the one,

confined in its application to the federal government, and declaring, inter alia, that no person shall be "deprived of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation"; the other, reading in part, "nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of its laws." And similar provisions have been incorporated in the Constitutions of probably all of the states. In the meanwhile the courts, having been called on to determine when property is to be considered "taken for public use," within the meaning of those amendments and provisions, reached different conclusions upon that subject, some of them holding that the expression applies only to tangible property actually taken; others, that it includes the impairment of any right, constituting an element of ownership in such property, though the thing itself be not taken. In some instances the state Constitutions have been amended by the addition of the words "or damaged" after the word "taken," and it has been held that under such amended provisions it is not necessary for the recovery of compensation that the damage shall be caused by an actual taking of, or trespass upon, the property, but that if the public use of the property which is taken is of such a character as to impair the owner's use and enjoyment of property not actually taken or trespassed on, he may recover.

In this state the Constitution of 1812 contained nothing more specific upon the subject of taking or damaging property for public purposes than the declaration in the Bill of Rights that the Constitution was ordained "in order to secure [to the citizens] the enjoyment of the right of life, liberty and property." In the Constitutions of 1845, 1852, 1864, and 1868 there are provisions to the effect that "vested rights" shall not be devested, except for purposes of public utility, and for adequate compensation previously made (the word "previously" being omitted from the Constitution of 1868). To those provisions there are added in the Constitutions of 1879, 1898, and 1913, the articles 156 and 167, respectively, identical in terms, and reading:

"Private property shall not be taken nor damaged for public purposes without just and adequate compensation being first paid."

Since 1855, however, the general statute law of Louisiana authorizing the expropriation of private property for public purposes has contained the provision (which appears to have been sometimes overlooked) that the juries in such cases "shall determine, after hearing the parties and their evidence, what is the value of the land described in the petition with its improvements, and what damages, if any, the owner would sustain, in addition to the loss of the land by its expropriation." R. S. 700, 1481; C. C. 2632; Acts 1855, p. 33, § 3.

On the other hand, it has long been settled by decisions of this court and of the Supreme Court of the United States that under our law riparian lands are burdened with a servitude in favor of the public, by reason whereof such portions of them as are necessary for the making or repairing of the levees which confine the waters of the streams upon which they border may be taken or damaged without compensation to the owner; the doctrine upon that subject being, that the state does not exercise the power of eminent domain by expropriating the property, but lawfully appropriates it to the use to which it is subjected by the title under which it is held, and hence that the private injury resulting therefrom is damnum absque injuria. C. C. 665; Hanson v. Lafayette, 18 La. 295; Bourg v. Niles, 6 La. Ann. 77; Zenor v. Parish of Concordia, 7 La.

Ann. 150; Dubose v. Commissioners, 11 La. Ann. 165; Bass v. State, 34 La. Ann. 494; Ruch v. City, 43 La. Ann. 275, 9 South. 473; Peart v. President of Levee Dist., 45 La. Ann. 421, 12 South. 490; Sauter v. Town of Vidalia, 110 La. 386, 387, 34 South. 558; Eldredge v. Trezevant, 160 U. S. 452, 16 Sup. Ct. 345, 40 L. Ed. 490.

To the general rule thus established and recognized an exception has been provided, first by statute (Acts 41 of 1892, p. 46, and 25 of 1894, p. 28), then by the Constitution of 1898 (article 312), and again by statute (Acts 79 of 1898, p. 101, and 35 of 1902, p. 43) in favor of property owners in the Orleans levee district. The reasons for and terms of the exception appear in the preamble and body of the act of 1892, as follows, to wit:

"Whereas, it has become necessary to construct new levees in the sixth and seventh municipal districts of the city of New Orleans; and

"Whereas, the location and construction of these levees has been made under peculiar conditions which arise from the large number of small properties and tenements on the line of the said levees, which conditions do not usually exist.

* * * * * * *

"Section 1. Be it enacted * * * that the board of commissioners of the Orleans levee district be and is hereby authorized and directed to levy an additional special tax for the year 1892, not exceeding four-fifths of a mill on the dollar, * * * for the purpose of indemnifying the owners of property in said Orleans levee district, appropriated, damaged or destroyed by said board in the construction of levees in said district; * * * that, in no case shall the amount paid to such owners of the appropriated property exceed the assessed value thereof at the time of the appropriation."

The act of 1894 is confined in its application to the owners of the property situated in the sixth and seventh municipal districts.

[1] The new article that was incorporated in the Constitution of 1898 reads in part as follows:

"Art. 312. Any person whose property has been appropriated within twelve months prior to the adoption of this Constitution, or whose property may hereafter be appropriated by the Orleans levee board, for levee purposes, shall have a right in action against said board

* * * for the value of said property." [Then follow exceptions in regard to batture, vacant land and certain other property, after which:] "Provided, that said board shall have power to appropriate property subject to such servitude, for levee building, as under existing laws, without making such compensation in advance."

The act of 1898, adopted after the Constitution went into effect, authorizes the levy of a special tax for that year "for the purpose of indemnifying the owners of the property in said Orleans levee district, appropriated, damaged or destroyed by said board," and contains the proviso:

"That no payment shall be made under the provisions of this act unless and until the property owner shall, in consideration thereof, sell, transfer and deliver to the city of New Orleans all his right, title and interest in and to the property so appropriated."

The act of 1902 purports to authorize the payment of claims for property appropriated, damaged, or destroyed out of the unexpended balance of the tax authorized by Act 79 of 1898, and is prefaced by a preamble which recites that many persons whose property was so dealt with had been compensated; that others, who are named, had received nothing; and that it would be inequitable not to compensate them. Therefore:

"Be it enacted * * * that said parties hereinabove named and all others similarly situated do have a right of action against the Orleans levee board for the losses sustained by them on account of the damage, taking or destruction of their property for levee purposes during the years 1894 and 1895; and the amount of the claims established by them shall be payable out of the fund collected under Act 79 of 1898: Provided that not more than $15,000.00 shall be set aside and made available for the payment of all claims under this act."

It is quite possible that the purpose of article 312 of the Constitution, in its original form, was to restrict the right of recovery to the bare value of the tangible property actually taken; but it is also quite possible that the original form was changed before the adoption of the proposed article, or it may be that the body of the convention placed an interpretation upon it not contemplated by its

authors, and yet admissible. The question to be here determined then is not what may have been the purpose of the framers of the article, but whether, as it now stands in the Constitution, it is reasonably susceptible of the interpretation that has been adopted by the General Assembly.

Interpreting the Fifth Amendment to the Constitution of the United States where it has been invoked in support of claims for consequential damages resulting from government work for the improvement of navigable streams, the Supreme Court of the United States has rested its rejection of such claims upon the two grounds, to wit, that the damages were the incidental consequences of the lawful and proper exercise of governmental power, and that riparian property is subject to the obligation to suffer the consequences of the improvement of navigation in the exercise of the dominant right of the United States in that regard. There appears to be a single exception to the jurisprudence of the court upon the proposition first mentioned (Pumpelly v. Canal Co., 13 Wall. [80 U. S.] 166, 20 L. Ed. 557); but, whether in the cases constituting the rule or the exception, the court has always, as it appears to us, rather emphasized the fact that the property with respect to which the damage was claimed constituted a different unit from, and formed no part of that which had been actually and physically taken.

In the Pumpelly Case, supra, the damage was caused by the building of a dam across an outlet of Winnebago Lake in Wisconsin under the authority of territorial and state legislation, as a result of which a distant tract of land was invaded by water, earth, and other material, and rendered useless to the owner. In deciding the case in favor of the plaintiff the court, through Mr. Justice Miller, said:

"We are not unaware of the numerous cases in the state court in which the doctrine has been successfully invoked that, for a consequential injury to the property of the individual, arising from the prosecution of improvements of roads, streets, rivers, and other highways, for the public good, there is no redress; and we do not deny that the principle is a sound one, in its proper application to many injuries to property so originating. * * * But we are of opinion that the decisions referred to have gone to the uttermost limit of sound judicial construction in favor of this principle, and, in some cases, beyond it, and that it remains true that, where real estate is actually invaded by superinduced additions of water, earth, sand or other material, or by having any artificial structure placed on it, so as to effectually destroy it or impair its usefulness, it is a taking, within the meaning of the Constitution," etc.

In the later case of Northern Trans. Co. v. Chicago, 99 U. S. 635, 25 L. Ed. 336, it appeared that plaintiff owned land at the intersection of La Salle street and the Chicago river, upon which it had valuable dock and warehouse accommodations, at which many steamers made their landings, and that it was interrupted in the use of its property by the excavation, by authority of a state law, of a tunnel under the river, which necessitated the obstruction of the street, and by the building of a coffer dam in the river, which obstructed that stream; wherefore it sued the city for damages. It was, however, held that the injury complained of was damnum absque injuria; the court, through Mr. Justice Strong, saying (inter alia):

"But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the state or its agents, or give him any right of action. This is supported by an immense weight of authority. Those who are curious to see the decisions will find them collected in Cooley on Constitutional Limitations, p. 542, and notes. The extremist qualification of the doctrine is to be found * * * in Pumpelly v. Green Bay Co., 13 Wall. (80 U. S.) 166, 20 L. Ed. 557, and in Eaton v. Railroad Co., 51 N. H. 504 [12 Am. Rep. 147]. In those cases it was held that the permanent flooding of private property may be regarded as a 'taking.' In those cases there was a physical invasion of the real estate of the private owner, and a practical ouster of his possession. But in the present case there was no such invasion. No entry was made upon the

plaintiff's lot. All that was done was to render for a time its use more inconvenient."

In Chicago v. Taylor, 125 U. S. 161, 8 Sup. Ct. 820, 31 L. Ed. 638, it appeared that a lot owned by Taylor was damaged by reason of the construction, by authority of a city ordinance, of a viaduct in its immediate vicinity. The court said:

"For many years prior to, as well as at, the time this viaduct was built, the lot in question was used as a coalyard, having upon it sheds, machinery, engines, boilers, tracks, and other contrivances required in the business of buying, storing, and selling coal. The premises were long so used and were peculiarly well adapted for such business. There was evidence before the jury tending to show that, by reason of the construction of the viaduct, the actual market value of the lot, for the purposes for which it was specially adapted, or for any other purpose for which it was likely to be used, was materially diminished, access to it from Eighteenth street being greatly obstructed, and, at some points, practically cut off; and that, as a necessary result of this work, the use of Lumber street, as a way of approach to the coalyard by its occupants and buyers, and as a way of exit for teams carrying coal from the yard to customers, was seriously impaired."

The court found that the Constitution of Illinois, adopted in 1848, provided that no man's property should "be taken or applied to public use without just compensation being made to him," and that it had been held by the Supreme Court of that state in construing the provision that acts done in the proper exercise of governmental power and not directly encroaching upon private property, though their consequences might impair its use, were universally held not to be a taking within the meaning of such provision. It further found that the Constitution of 1870 contained the provision, "Private property shall not be taken or damaged for public use without just compensation," and that thereafter it became the settled doctrine of the Illinois court that:

"Any actual physical injury to private property by reason of the erection, construction or operation of a public improvement in or along a public street or highway, whereby its appropriate use or enjoyment was materially interrupted or its value substantially impaired, was regarded as a taking of private property, within the meaning of the Constitution to the extent of the damages thereby occasioned," etc.

In Gibson v. U. S., 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996, it appeared that plaintiff owned a tract of highly cultivated land devoted to truck farming, on Neville Island, in the Ohio river; that under the direction of the chief of engineers and Secretary of War, a dike was constructed in the river with a view of improving the navigation, but one of the effects of which was to obstruct the communication between the channel and plaintiff's landing during the greater part of the year, thereby reducing the value of the land from $600 to $150 or $200 an acre. Among the facts found by the Court of Claims, from which the case was appealed, were the following:

"There was no water thrown back on plaintiff's land by the building of said dike, and said dike has not itself come into physical contact with claimant's land and has not been the cause of any such physical contact in any other way. In making the improvement the defendants did not recognize any right of property in the claimant, in and to the right alleged."

In affirming the judgment rejecting plaintiff's demand the court, through Chief Justice Fuller, said:

"The Fifth Amendment to the Constitution of the United States provides that private property shall not 'be taken for public use without just compensation.' Here, however, the damage of which Mrs. Gibson complained was not the result of the taking of any part of her property, whether upland or submerged, * * * but the incidental consequence of the lawful and proper exercise of governmental power."

[2] In the case that we are now considering, the injury of which plaintiff complains is the direct result of the actual physical encroachment upon and appropriation of (say) one-half of a tract of land which (with its improvements), considered as a unit, appears to have been well adapted to the purpose for which it was being used, and (with or without the improvements) may have been desirable for other purposes, for which the remain-

ing half, left to the owner, would be wholly inadequate or unsuited. Article 312 of the Constitution gives plaintiff a right of action for the value of the property appropriated, and it would be as inconsistent with that grant to hold that such value can be ascertained merely by dividing the aggregate market value per square foot of the entire tract as it stood at the time of the appropriation, and attributing the quotient to the part which has been appropriated as it would be to apply that process to the ascertainment of the value of the one half of an oil painting, severed from the other half and so appropriated, or of a single building, or of a collection of buildings constituting an industrial plant. In almost any case that can be conceived the principal value of the half of a thing consists in its serving as the complement of, and thereby giving value to, and receiving it from, the other half. A building may be well worth $10,000; cut it in half and that which remains may be worth no more than the cost of the wreckage, or practically nothing. The half which is taken while in place may therefore be worth $10,-000, not only to the owner, but in determining the value of the property as a whole for any purpose, and if the owner receives but $5,000, he submits to a loss of $5,000. The evidence shows that the building of the Ursulines was about 400 feet long, and the chaplain of the convent gives the following testimony as to what was done with it in the construction of the levee here in question, to wit:

"The building had to be cut in two, and one part of the building was on the levee side and the other on the other side of the levee, just like one might put up an immense house and cut it in two; now you take the parlor and dining room and run a levee, not only through the dining room, but the kitchen; you cut it in two, and they are not worth anything; you have the dining room in the front part and the kitchen was in the rear part, and we could not do anything with it."

[3] The Lambou & Noel Company owned a manufacturing plant consisting of a number of buildings, assembled, presumably, with a view to economy of labor and power and general efficiency. The levee having been laid off and constructed solely with a view of protecting the public from the waters of the Mississippi river, the levee board took so much of that property as was needed for that purpose, but, in so doing, it also took part of an established plant and plant site, which had a value distinct from its value as mere land to be occupied by levee; and, we understand, the owners were compensated with reference to that condition. We therefore conclude that article 312 of the Constitution, in giving to an owner—one-half we will say, of a particular unit of whose property has been appropriated—a right of action for the recovery of its value, contemplates the recovery of the value of such half, when in place and serving as the complement of the other half, and hence that such value is to be ascertained by deducting from the value of the entire unit, as it stood prior to the appropriation, the value of the remaining half, as it stands since the appropriation. We further conclude that, inasmuch as the grant contained in the article in question is exceptional in character, goes no further than to confer a right of action to recover the value of the property taken for levee purposes in a particular district, and differs from article 167 in that the latter requires the payment of damages, as well as value, in cases of expropriation, the plaintiff herein is not entitled to recover consequential damages, as such, for inconvenience of ingress and egress, deprivation of light or view, impairment of use, etc., save in so far as those conditions may affect that portion of its property which remains, and the value of which, as it stands, is to be deducted from the value of the whole, as it stood before the appropriation. The case, not having been considered in the district court from the point of view thus stated, and testimony offered on behalf of both litigants, tending to show the value

of the property as a whole prior to, and of the remaining portion after, the appropriation, having been, as we think, improperly excluded, must be tried anew. It is therefore ordered that the judgment appealed from be annulled, and this case remanded to the trial court, to be there proceeded with according to law and to the views hereinabove expressed, the costs of the appeal to be borne by the litigants in equal proportions, and those of the trial court to await the final judgment.

PROVOSTY and SOMMERVILLE, JJ., dissent, for reasons assigned in original opinion, and in dissenting opinion of PROVOSTY, J. See 78 South. 259.